and Biggs, and Ms. Schneemann, we'll begin with you. Good morning. The punitive damages imposed on Christopher Titus are grossly excessive and should be constitutionally corrected. Mr. Titus accepts the jury's determination that he is deserving of punishment, but we submit that his conduct was not so reprehensible that he deserves to be punished for the rest of his life by a debt that is so large and crushing that he is effectively sentenced to a lifetime of financial ruin. The $850,000 imposed on Mr. Titus is far more punishment than is necessary to achieve the state's legitimate objectives of punishment and deterrence. It is also utterly disproportionate to the punitive damages imposed upon law enforcement officers in cases involving far more egregious uses of force and causing injuries far more serious than those in this case. As the cases in the table provided in our opening brief reflect, juries in this circuit typically award... Ms. Schneemann, can we first, though, look at those factors, those state farm factors regarding... Degree of reprehensibility. Yes. Can we start there? Because I know we want to talk a little bit about those, because I think that's important, because I don't think that Swerson engages with the cases in the Seventh Circuit dealing with punitive damages that are this large. But I wanted to go back, if we can, to Guidepost 1 and those state farm factors. Right. Yes, the degree of reprehensibility is something that the court must consider in determining whether the punitive damages imposed on Mr. Titus are unconstitutional. And we submit that reprehensibility is somewhat ambiguous. The facts of every case differ, and that is why it is important for courts, and it is a legal question for courts, to determine the constitutional maximum of a punitive damage award that is appropriate in any case. We submit to your honor, we're not here today to make excuses... But what do we do with the Supreme Court giving us the directive that it's that factor? Right. Whether or not that conduct was reprehensible, that's the most important. It is the most important, yes. But what we submit is that conduct can be deserving of punitive damages, but there are degrees of reprehensibility, right? Right. And that's why it's important for this court to take a look at the factors here, and also in those state farm BMV factors, the difference between punitive damages awarded by the jury in our case and by juries in other cases. And that's why I kind of want to bring the court back to that table that we submitted in our... But I know where you want to start, but I want you to start with that conduct and walk through those factors and why that factor weighs in favor of lowering this particular award. I know where you want to start, but that's where I'd like for you to start. Right, right, Your Honor. Well, Mr. Titus's conduct did not result in a significant physical injury to Mr. Stewardson. There was a one-inch cut above his eye for which he did not seek medical treatment after he was released from jail. Just got some gauze pad when he was released in jail. The mental... This case involved mostly claimed mental and emotional injuries. Those are very intangible and difficult to prove. But the fact of the matter is, is that when we look at this case in comparison to cases, other cases in which punitive damages were awarded, the injuries to Mr. Stewardson were not severe. This is not like the cases where we have police officers who have punched citizens in the face, broken facial bones. This is not like cases where they have beaten subjects that have been restrained in medical wards, handcuffed to beds, causing serious injuries resulting in the need for surgery. This is not like the case we cited in our brief where a police officer indiscriminately shot into a crowd of people, shot three innocent civilians, causing them multiple gunshot wounds. In all of those cases, the jury's awarded punitive damages only a fraction of the compensatory damages. And here, we have conduct that is not anything like the conduct in those other cases. Why shouldn't we be more deferential, though, to the district court? They had a remitted or motion. The district court had a remitted or motion before it. The district court heard the evidence, saw the people testify, instructed the jury. Close questions like how much is too much for reprehensibility that was determined by a jury, and the district court had all that in front of it, then yet denied the remitted or motion. Why shouldn't we defer to that call? Your Honor, there are several reasons. One, the courts have a duty and legal obligation to consider the constitutional maximum of a punitive damages award. And here we're at a 2.1 ratio. We're within what that normal ratio would be. Well, arguably, yes. I want to make sure I circle back to your first question. But with respect to the ratio, it's important for this court to also observe that in typical cases, the majority of cases that we found in our legal research, the punitive damages that are imposed are a mere fraction, not twice or more than twice the amount of the compensatory damages awarded as they are here. And I want to make the point, too, that not only the United States Supreme Court in the State Farm v. Campbell case, but also this court, and I know it's cited in our brief, although I don't have it off the top of my head, has recognized that when the compensatory damages awarded are substantial, and they were substantial in this case. The award was $400,000. When the compensatory damages are substantial, the Supreme Court in, again, State Farm and this court, have suggested that a ratio of one-to-one very well may be the constitutional maximum. So if we were to pose to you the question of what's the limiting principle, how much should we as a federal appellate court cut down this figure, would your answer then be one-to-one? No, but I do suggest that one-to-one is something that the courts have suggested. We think that the court must take into consideration all of the factors, including the amount of punishment. Again, punitive damages are intended to punish the wrongdoer and send a signal to other people not to do the same thing, right? It's not intended to be a windfall for the plaintiff or extra damages, a bonus for the plaintiff. The plaintiff in this case has been fully compensated. What the punitive damages are supposed to do, again, is to punish the wrongdoer. What amount of punishment is appropriate in this case and the constitutional maximum? And we submit that a $50,000 punitive damages award is a very serious punitive damages award in this case, not only given the facts of this case, but also comparing the facts of this case to the facts of other cases in which juries have awarded punitive damages. The reason, in part, that this is such an onerous and oppressive and grossly excessive punitive damages award is because it imposes punishment on a young man who now is only 33 years old but was even younger at the time of modest income that is going to financially burden him for the rest of his life. And you chose not to present evidence of his financial situation, as was your right to the jury. I want to move on to intervening, opportunity to prevent and intervene. Is your position that an opportunity to prevent or intervene for a supervising officer should be limited to instances where the officer is physically present during the use of force? And I'm asking that because didn't we hold in Yang that officers could not ignore their duty to prevent fellow officers quote, who summarily punish a third person in his presence or otherwise within his knowledge, end quote. So I'd like you to address our holding in Yang. Right, right. The cases that this court, the cases in which qualified immunity has been granted, and we're now talking about the cross appeal, but the cases in which qualified immunity has been granted and the cases which consider the duty to intervene, Yang holds that an officer must be present, a law enforcement officer must be present while the force is being used. And if this court is going to move away from Yang or establish new law that an officer who witnesses force on one occasion and then maybe there's another use of force by a fellow officer on another occasion in a different location minutes later, hours later, where the officer accused of failing to intervene is not even present. Can you address our language or otherwise within his knowledge? Well, the use of force, the hip toss that's at issue. That's what I'm referring to. Right, right. The hip toss was not within Officer Bigg's knowledge. He was not there. He didn't witness it, nor did he anticipate it. So now we can say in hindsight that the force Mr. Titus used when he shoved Mr. Stewardson into the wall or when he used his leg sweep to take Mr. Stewardson to the ground, the jury has decided that that was excessive force. But Mr. Biggs, while he witnessed those two things, did not necessarily see them at the time as an excessive use of force. But even assuming that he had, the bottom line is he was not. Why would we have used that language in Yang if the duty to intervene or prevent is limited to punishing a third person in his presence, if it's limited to being present? What work is this phrase or otherwise within his knowledge doing? Can you give me an example? Well, I submit to you, Your Honor, otherwise within his knowledge can't be for trying to forecast the future, anticipate something that may or may not happen in the future, and prevent something in the future. But I want to also add that Section 1983 liability is premised on fault and based on personal liability. And it's difficult for us to reconcile that a person can have personal liability and fault for something that he or she is unaware occurred or is occurring. Mr. Biggs was not present when that hip toss occurred. And to say that failure to intervene liability can somehow be separated from an officer's presence or observation of the force while it is going on is essentially distorting the whole foundational premise for Section 1983 liability. The bottom line is Mr. Biggs could not have stopped or cautioned a hip toss that he wasn't present to witness or see was occurring. So I want to focus back on... Or would you like to reserve the remainder of your time? Oh, yes, I would. Very good. Thank you, Ms. Schneeman. We're now, Mr. Keller, going to move to you. Good morning. Good morning. May it please the court, I'm Durand Keller. I have the honor of representing Blake Stewartson, who is the appellee and also the cross-appellant here. Good to see you again. So Mr. Titus has said here that this is constitutionally excessive, that he didn't get due process. And if we look at what happened here, we had substantial discovery. We had a jury trial. They took the first appeal, used a lot of resources, a lot of depositions, and then got precisely what they wanted, a jury trial on all of these issues. Yet he says that he didn't get due process. And the main argument, well, let me start with what matters. The Supreme Court's guideposts. Reprehensibility, the ratio of disparity of harm, actual harm, and as compared to punitive damages. And then the least relevant is the comparable penalties. So, reprehensibility, the most important factor. So do you engage? Yes. Do you engage at all with the third, the one that you said is the most or the least useful, the comparable cases? Yes. Would you like me to start there? I would because I don't see that you engaged with that in your briefing. So I question whether or not any argument that you present on that is waived. I appreciate that. Let me see if I can answer. Below with the district court and in the court. Is your argument waived? No. Why not? Because the district court's order cites that the parties have each submitted many cases that are comparable, some lower than what they said, some higher. So, no, I don't believe the argument is waived. But it also brings up a point. Did you address it in your appellate brief? I'll be honest, I don't remember. You don't remember what you've disclosed in your briefing? I don't remember whether we addressed the specific cases that we cited to the court below. Do you recall if you addressed the third guidepost in your briefing? I believe in our reply, which is the last brief. In your opening brief because we understand that new arguments cannot be raised in a reply. Understood. So to redirect here, did you raise this argument regarding the third factor, the third guidepost in your briefing to this court? I don't remember. I'm sorry. I could supplement and look at the brief, but I just don't remember. I apologize. But to the extent that you raise the argument about this award is perfectly fine, that's different from failing to engage with certain cases in your brief. So I guess you have made the argument that the verdict should stand because it's perfectly within the guidance we've gotten from the Supreme Court. You've made that argument? Yes, Your Honor, we did. Thank you. So did you waive? I don't believe that we waived because, and I promise I won't fully answer your question. You're asking if I waived. I don't believe we did, but I can't tell you what was in that opening brief. I just can't. I'm sorry. All right. So let's look at the third factor. Okay. Here's what's important. We talk about comparable cases. Most cases don't go to trial. That's one of the problems with that third factor. We could cite a litany of cases I've had alone in the last two years that are at or above this amount. And so that's why this third factor. And then if you look at, I think the crime of murder in Indiana is like a $10,000 penalty. How could that third factor be huge? It's the smallest thing our case law has said that that is not the biggest determinant here. And I apologize that I can't give you a better answer on the third factor. I don't believe it's at all dispositive. I know the district court did rule that there were cases going both ways. And I'm sorry I can't do better than that. Ms. Schneeman has offered $50,000 as a figure.  The jury obviously went much higher than that. The remitter motion was before the district court. District court made a decision to deny the remitter motion. Is there something in the record that you see that justifies that smaller amount? Or are you asking us to defer to the jury in the denial of the remitter? I'm certainly asking the court to defer to the jury. I think that's paramount. Our courts have said that. The $50,000 number was just made up. But we know that. We can just say it now. It doesn't come from anywhere. If anywhere it comes from the Sacramento, no, that was a one-to-one ratio. It's made up. That's where it comes from. Ours is actually from a jury who was well-impaneled, well-instructed, and deliberated. And we know that juries can come to different decisions. There are no two cases that are the same. I hope I answered your question.  As to reprehensibility, every single box is checked. Every single one here. You had physical, repeated contact. Mr. Stewardson, having the worst night of his life, the love of his life had rejected him. He was drinking and driving, pled guilty to this. He gets slammed against the wall as soon as Titus gets a hold of him. As soon as he gets a hold of him. Takes him to a cell, slams him down on the ground. Right in the vicinity of everybody else. Then people are on top of him for 26 minutes. He has a strike. After they finally strip him naked and when they finally leave him alone, the supervisor Biggs tells him to come back. Tells Titus to go back and deal with him. He didn't even need to go in the room. And then that's when he gets slammed down again. There was a pool of blood. I take exception to this notion that there weren't severe injuries. But I don't want to waste my time on that. On the failure to intervene, the initial failure to intervene that went to trial, at that instance, Mr. Stewardson was fully cuffed. The failure to intervene that occurred, that's still present in front of us, he has one cuff on and one cuff is off, is that correct? I believe they were both off at this time. Both off. That's what my co-counsel is going to be handling. Very good, thank you. All right. Trying to figure out how to spend the majority of the remainder of my time. So they cited to the Sacramento case. That was some mistakes that were made in a mortgage. That's what they cite to as their loan authority for being a one-to-one ratio and saying it should be done here. But in that case, it said the difference is they said it was reprehensible but not to an extreme degree. There was no physical contact whatsoever. It didn't reflect any injury to health or safety. And there was no evidence of malice. It's not anywhere near close to this one. What's a lot closer is the Rainey v. Taylor case from the Seventh Circuit from a month before in 2019. And in that case, they upheld a six-to-one ratio, which in this case, by the way, could have been much closer to a 9.9-to-1. We'd be talking $4 million. That'd still be constitutional. In the Rainey case, it was a six-to-one ratio, $1.13 million in compensatory and $6 million in punitives. And that was upheld. They didn't want to talk about the case that was cited in the Sacramento case. That's a lot closer to this one. But this one's worse because in the Rainey case, you had sexual assault, and it was repeated. It was touching is what it was in the vicinity at a club with everybody else. This is completely different. They chose not to bring anything up to the jury on his finances. We don't even know. There's no actual record evidence of any of this stuff because they didn't put it before them. They got due process, and I apologize. I'm saying that my time has run out. I hope that I've answered the questions, and thank you all for hearing us. Thank you very much, Mr. Keller. Mr. Harris, we'll now move to you. May it please the court. I'm Marty Harris. I also represent Mr. Stewartson. I'll start by answering your question, Judge Brennan.  At the time of this failure to intervene, both of the handcuffs were off. I don't know if you have any follow-up on that. No, but thank you for that clarification. Okay. The district court made three errors at summary judgment in three different buckets. There was the failure to intervene bucket. There was the excessive force bucket, and there was the Monell custom bucket. For the failure to intervene, the error was the district court ruling that no reasonable person would know to intervene against Officer Titus' brutality at the time it was happening in order to protect Mr. Stewartson from further brutality. For the excessive force, the district court did not analyze the amount of force that Officer Biggs had used, which Officer Biggs admitted was the maximum amount that he could muster. Also for excessive force, the district court did not analyze the individual uses of force. Instead, it erred by concluding generally that Mr. Stewartson had, over a period of time, been uncooperative, disruptive, and threatening. Those things were jury questions, not questions for summary judgment. For the Monell custom, the district court erred by not considering the existence of the custom and then by concluding with ambiguous evidence that Mr. Stewartson was suicidal. Therefore, his being stripped and strapped was constitutional. Those were jury questions, not questions for summary judgment. So I'll start with failure to intervene since it seems like that is what this panel is most interested in. The clearly established law is that if an officer does not take a reasonable opportunity to at least warn a fellow officer from committing excessive force, then they're both responsible for later excessive force. That puts the second officer in a very difficult position, though, because any time they'd interact with anyone who was under arrest, they'd have to give a warning. Obviously, they can't see the future. Obviously, they can't see the future. But if they're involved in an arrest where excessive force is being used, which is the situation analogous to what we have here, the absence of a warning at that time to stop using excessive force, the absence of a warning in the next half hour to stop using excessive force, which then immediately leads to more excessive force, that's the situation that we're dealing with. I thought this was a little factually different with the excessive force. And maybe I'm conflating the two, and so help me. As far as with the excessive force with Deputy Biggs, I thought it was the knee strikes. The excessive force with Deputy Biggs is the knee strikes. That's bucket number two of the cross. I wanted to make sure.  And the failure to intervene here is when Deputy Titus does what I'm calling the sweep. I believe in the district court the sweep referred to as being thrown to the floor initially. Okay. And that we're talking on this appeal about what was called the hip toss. The hip toss. So I'm using the wrong term. So yes, the hip toss.  Yes. And where you're going is that by the time Biggs sees Titus slam him against the wall and do a leg sweep, at that point, whether or not he can guess that a hip toss is coming down the pipe next, under your theory, he's obligated under our case law to then warn Titus, hey, no more excessive force. Regardless of whether Biggs knew a hip toss was happening, he did have the obligation at that time. The wall slam, the second wall slam, or the throw him to the floor. At that time, his duty to intervene arose. Based on the three things he had seen before. The three things that he had seen before put him on notice that there's a need to protect Mr. Stewartson from Officer Titus. He didn't take advantage of that opportunity. Is there a clearly established case law that says that? Yes. The clearly established case law is Yang, which is cited in our brief. It's Lanigan, which is cited in our brief. When this case first came up on appeal two years ago, Judge Jasson-Kumey and Judge Pryor both ruled that the question of whether there was a reasonable opportunity to intervene is a question for the jury. The court ruled, right? Yes, the court ruled. Both of these judges were on that previous panel. In that ruling, there was a decision that 30 seconds between the second wall slam and the being thrown to the floor, that created a jury question as to whether there was a reasonable opportunity for Officer Biggs to tell Officer Titus to stop, to tell Officer Titus to not do that again, to correct Officer Titus' misconduct. If there's a jury question of that in 30 seconds, how could there not be a jury question of the additional 30 minutes that Officer Biggs had as an opportunity to tell Officer Titus, this is unacceptable, this is not what we do as officers, to then turn around and send Officer Titus back into that room alone with Mr. Stewartson without any warning, without any intervention? A jury could determine that it's reasonably foreseeable at that point that since every single time that Officer Titus interacted with Mr. Stewartson that night, excessive force occurred, that excessive force would occur again absent that warning. The case law seems to admit of a major difference, though, between an individual who is handcuffed and not handcuffed. I agree that there, I think that is more towards the excessive force reasonability analysis as opposed to the failure to intervene analysis. The failure to intervene analysis is dependent on do you have reason to know that you need to intervene, did you or did you not intervene, and did further violence occur? That's the Lanigan case, and the reason why Lanigan went in favor of the officers is because in that case there was no further violence alleged. Here we do have the further violence, and so I hope that answers your question? It does. Supervisors have a duty whether or not they're supervisors, but here he was a supervisor, and in his supervisory capacity he sent Officer Titus back into that room without the intervention that was necessary. I see that I have a minute left, so I want to just quickly on excessive force. Our argument is that there is waiver by Mr. Biggs as to the amount of force used. That was never argued in the district court. It wasn't even really argued here on appeal. There was no analysis of the amount of force used in the district court. The district court's decision generally concluded that it was reasonable to use force at some point, but it never identified what that point was in the 26-minute video, which is part of the record here. So excessive force needs to be remanded on that basis. And on the Monell custom, there was no analysis of the district court of the existence of the custom. Deputy Titus's testimony establishes a custom. He was questioned specifically suicidal or not. Somebody doesn't comply with the strip search and intake procedures, their clothes are coming off right. Deputy Titus agrees with that. There could not be a better lay definition of a Monell custom than what came out of Deputy Titus's mouth, and that custom resulted, as argued in the brief since I'm out of time, in Mr. Stewartson being stripped at least as a jury question. Thank you. Thank you, Mr. Harris. Ms. Schneeman, we'll move back to you. Thank you. I want to start with the last thing that my opposing counsel said. The plaintiff has mischaracterized the testimony. I think if the court looks at docket 111, the district court 111-4, Christopher Titus's testimony on page 194 through 195, Mr. Titus was explaining that if you come into the jail and you don't allow yourself to be subjected to a pat down, and then you refuse to voluntarily change into an orange jail uniform, the officers will remove your clothing for you. Mr. Titus was explaining that it's important to make sure that drugs, weapons, and contrabands don't get into the jail. And if the court looks at that testimony, it will see that Mr. Titus did not say anybody who comes into the jail and is not cooperative with the booking process is going to be stripped naked and put in a restraint chair. That is an inaccurate summary of the testimony. Also, with respect to the excessive force, the plaintiffs are trying to send back to the district court the two knee strikes performed by Cameron Biggs. Cameron Biggs testified. The court looks at docket 111-3, pages 49 and 50. Mr. Biggs was testifying about how peronial knee strikes are performed in general. Are we able to look at that testimony if this was dismissed on summary judgment? Well, this was the testimony that they cited in their motion for summary judgment. They only gave the district court the page and line numbers. They did not discuss the testimony. I see that my time is up. You may finish your thought. Yes. I think it's important for the court to look at what Mr. Biggs actually said because the question put to him was can you describe the physical motion of performing a peronial knee strike? And he did. He basically said you swing your leg back. Then the follow-up question was do you strike with all your available strength? He said yes. There is no testimony. The plaintiffs did not submit any evidence to the district court that the force used was too much. Mr. Titus or I'm sorry, Mr. Stewardson didn't even offer to the district court that the peronial knee strikes hurt, that he had a bruise. There was no evidence that they contested the force. Thank you, Ms. Schneeman. Thank you, Mr. Harris. Thank you, Mr. Keller. The case was taken under advisement. The court is going to take a five-minute break.